## THE PEOPLE *vs.* THE RECTOR &c. OF TRINITY CHURCH, WM. H. PAINE and others.

Where, in an action by the people, to recover the possession of real estate, the answer denied the allegations of the complaint, and averred that no title accrued to the people within forty years, and that the defendants acquired title in 1786, and had been in possession ever since; *Held* that, to warrant a recovery, the plaintiffs must show either a title in themselves, or a vacant possession.

Under such circumstances, the plaintiffs cannot maintain their action on the ground that the people are the presumptive owners of all lands in the state, until title in another is shown, and that in ejectment it is not necessary for the people to prove title, in the first instance.

Where proof is furnished, of a tenant being in possession, the presumption is a fair one, that such possession is legal; and until the plaintiffs show some right to the possession within forty years, they do not furnish sufficient evidence to dispossess the defendant of the property claimed.

EJECTMENT for a lot of land on Murray street in the city of New York, commenced the 17th December, 1856. The complaint was in the usual form. The answer was in three parts: (1.) A general denial of the complaint. (2.) An allegation that no title accrued to the plaintiffs within forty years before this action was brought, and that within that period the plaintiffs had not received rents or profits. (3.) An allegation that the corporation of Trinity church was seised of the premises in 1786, and has held them ever since, and that the other defendants are in possession under that corporation. The issue was tried at the circuit, in February, 1859, before Mr. Justice SUTHERLAND and a jury, and the exceptions there taken by the plaintiffs were ordered by the circuit court to be heard in the first instance at the general term. On the trial the plaintiffs proved that next before and at the time of the commencement of this action, the premises were occupied by the defendants Huggins, Fling, Herring and Black, as sub-tenants of the defendant Paine, and that Paine paid rent for the premises to the corporation of Trinity church; and that the premises are a part of a tract now called the church farm, and which was formerly known as the company's farm, the

king's farm, the queen's farm, and the duke's farm. The plaintiffs also proved the following matters, viz : On the 19th August, 1697, Fletcher, then colonial governor, executed, in the name of the king, a lease of the farm above mentioned, to the rector and inhabitants of the city of New York in communion with the Protestant Church of England as by law established, for a term of seven years from the 1st August, 1698, at a yearly rent of sixty bushels of wheat reserved to the king. On the 16th March, 1697, the Earl of Bellamont was appointed governor, and succeeded to Gov. Fletcher. On the 12th May, 1699, a colonial statute was passed declaring said lease for a term of seven years an extravagant grant, and breaking and annulling the lease, and prohibiting all future grants of the farm, by any governor, for a longer term "than his own time of government," and declaring that such future grants should be *ipso facto* null and void ; which statute was duly confirmed by the queen in council on the 26th June, 1708. Governor Bellamont died the 5th March, 1701, and Viscount Cornbury was appointed governor the 13th June, 1701. On the 9th May, 1702, Gov. Cornbury, in the name of the crown, executed a lease of the farm to the rector and inhabitants of the city in communion with the established church, dated on that day, to hold during the term and time.that he should continue in office as governor, at the yearly rent of 60 bushels of wheat reserved to the crown. On the 24th January, 1704, the rector and inhabitants in communion, &c. leased the farm to one Ryers, for a term of seven years, at an annual rent of £30. In the year 1705, Gov. Cornbury made some other grant of the farm to the rector, &c., but it was wholly without authority. Lord Cornbury continued to be governor in 1708, and was succeeded by Lord Lovelace on the 18th of December, 1708 ; and Gov. Lovelace was succeeded by Gov. Hunter, the 9th September, 1709. Before Gov. Hunter came out to the colony, the rector of the church, on the 2d December, 1709, wrote to Col. Riggs at London, for his aid to secure favor with the new governor before his entering the colony, so that the

The People *v.* Trinity Church.

church might not be deprived of the farm, and that it might be secured to the church. On arriving at New York, Gov. Hunter, on the request of the church, consented to the church having the use of the farm for his time. The rector was not content with this, and wished the governor to join the church in a petition to the queen for a grant of the farm; but the govornor declined the request, and would do nothing by which his own successor might be affected. Gov. Hunter continued in office till after the 7th July, 1719. On the 23d July, 1713, an information was filed in the colonial court of chancery, on behalf of the crown, against the rector and inhabitants of the city in communion with the established church, complaining that quit-rents and other services due to the crown were in arrears in many cases, and that the rector, &c. were tenants in possession of certain tracts of land in the city, for which an arrearage of quit-rents and other services was due, and praying for a discovery of lands so held, of the title by which the same were held, of the rents and services reserved, and of the arrears, and for an account of payments and receipts, &c., in order that the court might decree such relief as should be just. On the 21st January, 1714, the rector &c. sent a petition to the queen, stating that Gov. Cornbury (now become, by the death of his father, Earl of Clarendon) gave the church a lease of the farm for seven years, and in the 4th year of Anne (A. D. 1705 or 1706) gave the church a grant in fee, at a nominal rent of three shillings, deeming the actual rent of the farm his own perquisite as governor; but that the corporation of the church is now prosecuted in the court of chancery of the province, in the queen's name, for the rents reserved in the previous leases, and that the grant in fee is thus rendered disputable; and praying that the chancery suit may be stopped, and the grant in fee confirmed. In the year 1730, by the Montgomerie charter, the farm is included in the unpatented and unappropriated lands of the crown. In 1733 an act was passed by the provincial legislature, which was confirmed by the king in 1734, by which the statute of the 12th May, 1699, in relation

to grants of lands by the governors of the province, above men-
tioned, was referred to and treated as in full·force. The first
constitution of this state, adopted in 1777, declared that the
free exercise of religious profession or worship should be with-
out discrimination or preference. By the act of 1779 Charles
Inglis, rector of Trinity church, was attainted of treason, and
his estates forfeited, and he was banished from the state. By
the same statute it was declared, that the absolute property
in all lands, rents, services, &c. belonging to the crown on the
9th July, 1776, did on that day vest in the people of this state.
In the year 1779 the legislature passed an act for the tempo-
rary government of the southern parts of this state; consti-
tuting, for that purpose, a body called the council of safety,
with power to make ordinances for sundry purposes in the
southern district, and in 1783 another act was passed supple-
mentary thereto. The council of safety, thus constituted, on
the 12th January, 1784, finding that the dissensions in rela-
tion to Trinity church might materially endanger the peace
of the city, made an ordinance which displaced all the wardens
and vestrymen of that church, and vested the estates of the
church, both real and personal, in certain citizens, nine in
number, "to be retained and kept by them, or any five of
them, until such time as further legal provision shall be made
in the premises." The legislature, on the 17th April, 1784,
adopted and confirmed the ordinance of the council of safety,
appointed a new vestry for Trinity church, and repealed all
the colonial statutes incorporating or endowing Trinity church.
In 1785 the house of assembly of this state instituted a com-
mittee to inquire into the title of the farm; and a report of
the committee was presented by Mr. P. W. Yates. That re-
port gives a·history of the leases, grants, statutes, &c., con-
cerning the farm; and states the conclusion of the committee
to be that the right and title to the farm were vested in the
crown before the American revolution, and are now vested in
the people of this state. The assembly concurred with the
committee in the report. By the second constitution of this

The People *v.* Trinity Church.

state, which went into operation the 1st January, 1823, the proceeds of all lands belonging to the state, thereafter to be sold or disposed of, are inviolably appropriated to the common school fund. By the revised statutes, the proceeds of all lands of the state not reserved or appropriated to public use are to be kept as a part of the school fund, and the care and disposition of such lands are vested in the commissioners of the land office, who are fully authorized to direct the disposition thereof.

No evidence was given by the defendants. The defendants moved the court to nonsuit the plaintiff and dismiss the complaint. The court granted the motion and dismissed the complaint, on the ground that the plaintiffs had failed to establish any title against the defendants, and that the action was barred by the statute of limitations. The plaintiffs excepted, and moved for a new trial, upon the exceptions.

*Charles Tracy,* for the plaintiffs. The only questions before the general term, are the two questions arising on the ruling of the circuit court, viz :

*First.* Did the plaintiffs fail to establish a title against the defendants ?

*Second.* Was the action barred by the statute of limitations ?

I. The title of the plaintiffs, against the defendants, was established at the trial. (1.) The people of the state of New York are the ultimate proprietors of all lands in this state. (*Const. of* 1846, *art.* 1, § 11. 1 *R. S.* 718, § 1.) (2.) The people, therefore, are the presumptive owners of any particular piece of land under consideration ; and no further evidence of title in the people is necessary in the first instance to make out a case in ejectment. (*People* v. *Van Rensselaer,* 5 *Seld.* 291, 297, 319. . *People* v. *Arnold,* 4 *Comst.* 508. *People* v. *Livingston,* 8 *Barb.* 253. *Wendell* v. *The People,* 8 *Wend.* 183, 188.) (3.) The evidence given on the trial showed affirmatively a perfect and ancient title in the people. The lot

in question is a part of the tract known first under the Dutch government as the company's farm, and afterwards known as the duke's farm, the king's farm, or the queen's farm, and more recently as the church farm. The entire farm belonged to the crown. The colonial governors had limited authority to give leases of it. In 1697 Governor Fletcher assumed to lease the farm to the church for a term of seven years; and this was deemed so much beyond his authority, that his lease was annulled as an "extravagant grant," by an act of the legislature in 1699, which also forbade any future lease by a governor for a longer term than his own time in office as governor. In 1702 Governor Cornbury executed to the church a lease of the farm for his own term of office, reserving a yearly rent of sixty bushels of wheat. This lease was made in the name of the sovereign, to whom also the rent was reserved. The church entered under that lease, as appears by the demise to Ryers in 1704, and the receipt of rents by the rector. In 1713 the crown asserted its title to the farm, by an information in the nature of a landlord's bill for discovery and relief, filed against the church. In 1730, by the Montgomerie charter, the crown again asserted its title to the farm. The title having passed from the crown of England to the people of this state at the revolution, the state government early examined into it, and the right of the state was ascertained and asserted in the house of assembly. (3.) In addition to the direct line of title to the people by succession to the sovereignty, a title in the people as against Trinity church is made out on other grounds. After the rector of Trinity church had been attained for treason, and his estates forfeited and himself banished, the council of safety removed all the church wardens and divested the corporation of all its lands, and vested the lands in certain citizens, to hold until further provision should be made by law. The lands were never granted back to the church. Nor could they be lawfully given to the church, because it would have been an endowment of a church, in violation of the constitution of 1777, then in force. (*Lie-*

*ber's Civil Liberty and Civil Government,* 99.) The seizure of church lands for the use of the new government in Virginia, by an act of the legislature passed the 12th January, 1802, was sustained by the courts of that state. (2 *Virg. Stat. at Large,* 314. *Turpin* v. *Locket,* 6 *Call's Rep.* 113.) The act of 1784 did not restore the lands to the church. On the contrary, while naming a new vestry for the church, it confirmed the ordinance of the council of safety, by which the estates were taken away, and repealed every colonial statute by which the church had been incorporated or endowed. (4.) No legal provision having been made for these unappropriated lands, the constitution of 1823, followed by the revised statutes several years afterwards, devoted their proceeds to the common school fund; for the benefit of which this action is brought. (5.) The fact that the defendants were all in possession, directly or indirectly, at the time of the commencement of the action, was well proved; and no question was made by the court of the case being well made out in that respect. The requirements of the practice as to that matter were fully complied with. (*People* v. *Van Rensselaer,* 5 *Seld.* 291, 319. *People* v. *Denison,* 17 *Wend.* 312. *People* v. *Arnold,* 4 *Comst.* 508.)

II. The action is not barred by the statute of limitations. (1.) There was no proof of occupancy by any of the defendants covering the period stated in the second defense, nor for half so long a time before the commencement of the action. (2.) There was no proof of the lot being inclosed or built upon for the period specified in the second defense, nor for half that period. (3.) The rector, &c. of the church originally entered the farm as tenants; and no holding over for any length of time can make their possession adverse to their landlord's title. (*Jackson* v. *Whitford,* 2 *Caines,* 215. *Jackson* v. *McLeod,* 12 *John.* 182. *Hodson* v. *Sharp,* 10 *East,* 360. *Balls* v. *Westwood,* 2 *Campb.* 11. *Ogle* v. *Birney,* 2 *Binney,* 468, 472. *Buller's N. P.* 103, 104. *Doe* v. *Moore,* 2 *Queen's Bench,* 555, 558.) (4.) The waiver of rent by the

people, or their mere omission to demand it, is a sufficient compliance with the terms of the statute to take a case out of its operation. (2 *R. S.* 292, § 1, *sub.* 2 ; *Id. 5th ed. p.* 502. *Act of* 1801, 1 *R. L.* 184, § 91. *Act of* 1788, 2 *Greenl.* 93. 9 *Geo.* 3, *c.* 16. 21 *Jac.* 1, *c.* 2, § 1. *People* v. *Arnold,* 4 *Comst.* 508.) (5.) The statute of limitations cannot be set up by the corporation of Trinity church. The statute in respect of actions brought by the people, limits the bar to cases where the defendant is a "person." This term does not include a body corporate, as do the terms used in the residue of the statute. (*St.* 3 *and* 4 *Wm.* 4, *c.* 27, § 1. 1 *Granger's Supt.* 450. 2 *R. S.* 292, § 1. 1 *id.* 768, § 3. 2 *id.* 703, § 34. *Smith's Com.* 688, § 544. *Betts* v. *Maynard,* 1 *Breese's Ill. Rep.* 11, 14.) This provision being a concession by the government of its prerogative as sovereign, is not to be enlarged by construction ; and the legislature cannot be presumed to have intended to confer upon corporations, which are restricted to the privileges plainly given to them, a favor which it would be ready to bestow upon individual citizens.

*G. M. Ogden, Wm. M. Evarts* and *A. J. Parker,* for the defendants. I. The plaintiffs show no title whatever to the premises in question. (*a.*) There is no presumption of title in favor of the state, except where lands are *vacant,* or are proved to have been vacant within forty years. (*Wendell* v. *The People,* 8 *Wend.* 183. *People* v. *Denison,* 17 *id.* 312. *People* v. *Van Rensselaer,* 5 *Seld.* 319.) (*b.*) In this case the plaintiffs show affirmatively that the premises are not only occupied, but that they have been occupied by the church since the lease of 1697—162 years. That the church took possession under its lease, appears from the fact that it leased the whole farm to Ryers in 1704. This, with the "information" of 1713, the address to the crown in 1714, letters, statutes, &c., the report of Mr. Yates in 1785, and other papers introduced by the plaintiffs, traces the possession of the church all the way down to the present time, when the

church is still found receiving the rents. Even on the plaintiffs' theory of presumption, it could not be available against such positive evidence of the defendants' continued possession. (*c.*) When the church is once shown to be in possession, the possession will be presumed to have continued, till the contrary is shown. It could, therefore, be presumed the church had been in possession ever since it leased to Ryers, even if there were no proof of subsequent possession. (1 *Greenl. Ev.* § 41.) (*d.*) A complaint by the people which did not aver the plaintiffs in possession within forty years, was held bad on demurrer. (*The People* v. *Clarke*, 10 *Barb.* 120.) Of course, the same state of facts proved will not sustain the action.

II. It was not necessary for the defendants to prove a title to the premises. There was nothing shown to put the defendants on their defense. The plaintiffs must recover, if at all, on the strength of their own title. (*Martin* v. *Strachan*, 4 *Term Rep.* 107, *n. Goodtitle* v. *Baldwin*, 11 *East*, 494. 3 *Phil. Ev.* 581, *Edwards' ed.* 2 *Greenl. Ev.* § 381.)

III. The plaintiffs have not only failed to show title in the state, but they have, in fact, shown the title to be in Trinity church. (*a.*) They have proved the leases to the church of 1697 and 1702, and the documents introducing them have also shown that the farm was granted by lease in fee to the church, in the fourth year of Queen Anne, (1705,) at the yearly rent of three shillings. The information of 1813 was filed for arrearages of *quit-rent*, thus recognizing the lease to the church, by claiming rents under it. The grant of 1705 was fully described in the address of 1714. It is also described in Yates' report, as bearing date 23d November, 1705. (*b.*) If it is claimed that by the colonial act of 1699 the previous seven years' lease was vacated, and the colonial governor was forbidden to make any lease except for his own time, we answer that that act was repealed by the colonial act of 27th November, 1702. (1 *Bradford's Col. Stat.* 196. *Van Schaick's Laws*, 31, 51.) This being a matter of law,

and a public statute, we have a right to show it by reference to the statutes. It is also shown by documents introduced by the plaintiffs. (*c.*) It does not affect the question, that the act of 1699 was approved and the repealing act of 1702 disapproved by the home government in 1708, because the grant of 1705 was made while the repealing act was in full force, and every thing done under the act before its disapproval or repeal by the home government is valid. (*Bogardus* v. *Trinity Church*, 4 *Sandf. Ch. R.* 737. *Sedgwick on Statutes*, 454. *Report Commissioners of Land Office, May* 12, 1836, *p.* 11.) . All the royal commissions provided that the colonial statutes should be valid till disapproved by the crown. (*Smith's History of N. Y. ed. of* 1830, *vol.* 1, *p.* 353. 3 *Col. Doc.* 828, 9. 5 *id.* 5, 11, 94, 267, 393.) (*d.*) Independent of the proper title thus shown, the defendants being proved to be now in possession, are to be deemed the lawful owners, till the contrary is proven. Possession is *prima facie* evidence of a seisin in fee. This presumption cannot be overcome by any other presumption, but only by proof of title in the plaintiffs. (3 *Phil. Ev. by Edwards,* 595. 2 *Greenl. Ev.* § 391. *Tappscott* v. *Cobb,* 11 *Grattan,* 172.) (*e.*) Under the first point, subdivision (*b*), it is shown that the church has been in possession 162 years. Forty years only would have given it a title by adverse possession. (1 *Rev. Laws,* 1813, *p.* 184. 2 *R. S.* 292. *Code,* § 75.)

IV. Rights under grants from the British crown are sacred under the 30th section of the state constitution of 1777, and the state government has no power to question the validity of such a grant, even by *scire facias.* (*The People* v. *Clarke,* 10 *Barb.* 120, 141. 5 *Seld.* 349, 360.) The 433d section of the code only applies to grants made by the people of this state. If the validity of such a grant cannot be questioned directly by *scire facias,* it cannot certainly be done indirectly by ejectment.

V. The original entry, under a lease for seven years, does not prevent the defendants setting up an adverse possession.

At the expiration of twenty years from the termination of the lease, the church will be deemed as holding adversely. (*a.*) The possession of the tenant is deemed the possession of the landlord, until the expiration of twenty years from the termination of the tenancy, or twenty years from the last payment of rent, *and no longer.* At the end of that time the possession will be deemed adverse. (2 *R. S.* 294, § 13. 3 *id. 5th ed.* 504.) (*b.*) The payment of quit-rents is not inconsistent with an adverse possession, that is, adverse as to the title subject to the quit-rents. (*People* v. *Van Rensselear,* 5 *Seld.* 342.) A grantee may hold adversely to his grantor. (*Id.* 343. *Osterhout* v. *Shoemaker,* 3 *Hill,* 518. 7 *Wheat.* 335. 4 *Peters,* 506.) (*c.*) It was of course competent for the crown, after the lease for a term of years, to make the grant of 1705. It was, in legal effect, a release of the landlord's title to the tenant, like the old form of conveyance by lease and release.

VI. The people are liable to be nonsuited in a civil action. (3 *R. S. 5th ed.* 867.)

VII. The decision at the circuit was correct, and judgment should be rendered for the defendants.

*By the Court,* INGRAHAM, J. In this case the people seek to recover part of the property held by Trinity church in this city. The complaint claims the property as belonging to them, and avers that they were possessed thereof on 1st January, 1856. The answer denies the allegations set up in the complaint, and also avers that no title accrued to the people within forty years, and also that the defendants acquired title in 1786, and have since been in possession thereof.

Upon the trial the plaintiffs proved the occupancy of the premises by some of the defendants, in separate parcels, and rested. The court, on the defendants' motion, dismissed the complaint. From that judgment the plaintiffs appealed. The ground on which the plaintiffs claimed to maintain the action, on this evidence, was that the people were the presumptive

owners of all lands in the state, until title in another was shown, and that in ejectment it was not necessary for the people to prove title, in the first instance. The cases of *The People* v. *Van Rensselaer*, (5 *Selden*, 291,) and *The People* v. *Arnold*, (4 *Comst*. 508,) are relied on to establish this proposition. The first of these cases was brought to recover vacant lands, and in that case it was said it was enough for the people, in the first instance, to prove that the premises in dispute were vacant and unoccupied within the 40 years, and that the defendant subsequently entered and made claim to them. The latter case was on demurrer, and did not present the question now before the court. The only question there was as to the sufficiency of the answer, and that pleading was held to be good. The answer in the present case appears to have been drawn after that one.

In *Wendell* v. *The People*, (8 *Wend*. 183,) the premises claimed were proved, by the attorney general, to have been vacant and unoccupied within 40 years previous to the trial, and there the presumption in favor of the state was held to be sufficient to put the defendants on their defense.

In *The People* v. *Denison* (17 *Wend*. 312) the same rule was adopted, and the court held that such proof of the premises being vacant was sufficient, in the first instance. But in no case to which we have been referred has such presumption of title been considered sufficient, without such proof of the lands being vacant within the period of limitation. If this is necessary in regard to unoccupied lands, to warrant the presumption of title in the state, without proof of title, how much more necessary to require the state to show some title, or the absence of any possession by others within 40 years, where, in order to maintain the action, it is necessary for the plaintiffs to prove that the defendants were occupying the property as tenants of a third party. Where proof is furnished of a tenant being in possession, the presumption is a fair one that such possession is legal; and until the plaintiffs show some right to the possession within 40 years, they do

not furnish sufficient evidence to dispossess the defendants of the property claimed.

In *The People* v. *Van Rensselaer,* above referred to, Judge Willard says, " At the time the counsel for the people rested the case, there was no sufficient evidence before the court to entitle the plaintiffs to recover, or to require the defendants to be put upon their defense. First, there was no proof that the premises were vacant," &c.

It is apparent that in that case such evidence was deemed necessary before the presumption of title in the people could be resorted to against the defendant in possession of, or even claiming, the property. On the trial of this case, no evidence of title, or of vacant possession, was offered by the plaintiffs. One or the other was necessary, to warrant a recovery, and the court was not in error in dismissing the complaint, for want of such evidence.

The judgment should be affirmed.

[NEW YORK GENERAL TERM, December 13, 1859. *Roosevelt, Sutherland* and *Ingraham,* Justices.]