ALONZO ROCK, Plaintiff, *v.* BELMAR CONTRACTING COMPANY, Defendant.

Supreme Court, Washington County, September 22, 1930.

*Milford D. Whedon,* for the plaintiff.

*Philip J. Cirillo* [*W. W. Norton* of counsel], for the defendant.

ROGERS, J. The plaintiff is the owner of lands adjoining the new Granville-Hartford State highway. The defendant built the road. The complaint alleges that the defendant trespassed upon

plaintiff's lands, opened a stone quarry thereon and wrongfully operated the quarry and took therefrom and converted a large quantity of rock. By stipulation in writing the defendant admits the trespass and conversion. The issue tried and submitted is the amount of damages.

The defendant used in the road about 24,000 cubic yards, loose measure, of stone, most of which came from the quarry on the plaintiff's property and the balance from the same outcropping of rock that extended southerly from plaintiff's lands into the right of way appropriated by the county from plaintiff's property. The quarrying operations upon plaintiff's land covered an area of about one-half acre. The ledge quarried was from nine to twenty-seven feet in height above the State road level, 133 feet east and west and about 182 feet north and south. This half acre of rock was of no value for farm purposes. The value of plaintiff's little farm was not reduced to any appreciable extent by the removal of this rock. The county appropriated from plaintiff's farm, for right of way purposes, a narrow strip of about an acre, including a small portion of the rock ledge. Plaintiff accepted payment therefor at the rate of fifty dollars per acre.

Plaintiff's ledge of rock was very advantageously located for defendant's purposes, being both at the side of and near one end of the road. The quality of the rock in the ledge had been approved by the Highway Department as suitable for road purposes. There was no market for the stone, except with defendant. If the State road had not been built the quarry would not have been opened. The defendant claims that there were two or three other quarry sites available along the road, which it might have acquired for small amounts. Plaintiff contends that his quarry was the only one having suitable rock. Without doubt plaintiff's quarry site was the best located. If there were other quarry sites available it does not appear how much the right to operate them would cost. While the defendant was the only prospective purchaser, nevertheless there was its special market for a quarry site, because it was necessary for the defendant to acquire a site and crush its stone in the vicinity of the road. The cost of hauling the crushed stone from Comstock, where a small quantity was obtained in the beginning for bridge purposes, or from other quarries located miles away from the construction work, was prohibitive. The State when advertising for bids, notified the prospective bidders that local rock was obtainable.

The plaintiff urges that he has proven $12,000 damages and asks to have this sum trebled. The defendant asserts it should pay on the same basis as the county, which would be twenty-five dollars.

Twelve thousand dollars would be a dozen times the value of the whole farm for taking rock on an half acre thereof. Such an amount seems excessive and if trebled outrageous. Twenty-five dollars for practically all the stone that went into twelve miles of State road also offends common sense.

Plaintiff bases his claim upon the rule invoked under certain circumstances in a trespass action that the value of the thing separated from the realty is the measure of damages where it has a value after removal and the land has sustained no material injury because of the removal. Stone, coal and other minerals, clay, sand, logs, etc., come within this rule. (*Worrall* v. *Munn*, 53 N. Y. 185; *Dwight* v. *Elmira, C. & N. R. R. Co.*, 132 id. 199.)

In *Barton Coal Company* v. *Cox* (39 Md. 1) we find: " Plaintiff is entitled to recover the value of the coal immediately upon its conversion into a chattel by a severance from the freehold, without abatement of the cost of severance. * * * such sum per ton, as the jury may find the said coal so mined was worth, when first severed from its native bed, and before it was put upon the mine cars, without deducting the expense of severing said coal from its native bed."

In *Hartshorn* v. *Chaddock* (135 N. Y. 116, 121) one may read: " If my neighbor remove from my land, by means of trespass, a load of sand or gravel, the act might have no appreciable effect upon the value of the property as a whole, and yet I would be entitled to damages, but in that case they would be measured by the value of the sand or gravel removed, and expense of repairing any injury caused by its removal."

*Dwight* v. *Elmira, C. & N. R. R. Co.* (132 N. Y. 199) states: " The rule is undoubtedly as stated by the learned judge in the *Whitbeck* case, (36 Barb. 644) that a recovery may be had for the value of thing destroyed, where it has a value which may be accurately measured without a reference to the soil in which it stands."

" The trees were cut down and taken from premises belonging to and in the possession of the plaintiff, situate on a mountain in the town of Day. Their removal from that place constituted the conversion, and their value at that place at the time of conversion is the measure of damages." (*Johnson* v. *Kathan*, 88 Hun, 456; *Disbrow* v. *Westchester Hardwood Co.*, 164 N. Y. 420.)

The case of *McCruden* v. *Rochester Railway Co.* (25 N. Y. Supp. 114; affd., 151 N. Y. 623), at page 117 reads: " The timber undoubtedly belonged to the plaintiff * * *. When it was cut down, even if it had been left upon the ground * * *. But the timber lying there would still be the timber of the plaintiff.

If some other person had taken it away, no doubt such other person would be liable to the plaintiff for its value. I can see no good reason why the defendant should be relieved from such liability because it committed what may be called a ' double trespass ' and took away the wood after it had injured the freehold by cutting down the trees."

In *Brown* v. *Sax* (7 Cow. 95) it was held where the defendant converted trees of plaintiff and sawed them into planks that the measure of damages was the value of the planks.

The party whose property has been tortiously taken is entitled to the enhanced value until it has been so changed as to alter the title, is a doctrine as old as the year books. In this court it has been held that the owner of timber may reclaim it when made into shingles. (*Betts* v. *Lee*, 5 Johns. 348.)

In the foregoing cases the court dealt with material such as coal, sand, gravel, logs, plank, shingles, that had a general market value. In this case the blasted rock had no general market value. There was no one to buy it or use it except the road contractor. The contractor was in the market to buy solid rock — a quarry site. Defendant had no desire to purchase blasted or loose rock It. wanted to do the quarrying itself.

The plaintiff might argue that, there being no diminution in the market value of the farm and there being no general market for the loose rock, we must measure the plaintiff's damages not by his loss, but by the wrongdoer's gain. " It is an elementary policy of the law that the wrongdoer shall not profit by his own wrong." (*Underhill* v. *Schenck*, 201 App. Div. 46; *De Camp* v. *Bullard*, 159 N. Y. 450; *Stebbins* v. *Frisbie, etc., Knitting Co.*, 201 App. Div. 477; *Beach* v. *Bongartz*, 191 N. Y. Supp. 336; *Bunke* v. *New York Telephone Co.*, 188 N. Y. 600.)

Plaintiff's experts, familiar with the cost of operating stone quarries, testified that the cost of drilling and blasting the rock was fifty to fifty-five cents per cubic yard. After being blasted it was still the plaintiff's rock. The defendant had not acquired the right to remove it from plaintiff's premises. When it did so it took property that was worth to it at least what it had cost to convert it from solid rock into the loose state. It was immaterial that the defendant paid the cost of this conversion. It had expended the money in wrongfully interfering with plaintiff's property. It had no right to remove the rock that it had wrongfully blasted. Therefore, its expenditure from a legal standpoint was loss to it. When it took the blasted rock from plaintiff's premises it gained the amount that it had cost to blast it. It had to have local rock from some source and if plaintiff had prevented

it from removing the blasted rock it would have had to acquire another quarry site and expend the necessary amount to blast out the stone. What it would cost, therefore, to rightfully blast the rock is the measure of saving that the defendant had in removing the plaintiff's rock which it had wrongfully quarried. Does this saving inure to the benefit of the plaintiff?

The defendant invokes the rule of avoidable consequences and the duty to minimize damages. This doctrine applies to breach of contract cases and in torts not involving willfulness. (*Norske Ameriekalinje Actiesselskabet* v. *Sun Printing & Publishing Assn.*, 226 N. Y. 1.)

The defendant's president asserts that he thought he had bought the right to quarry where he did from plaintiff's neighbor, and that defendant acted in good faith. The defendant's president was not particular in ascertaining the boundary lines of the rights which he had purchased. He claims that the plaintiff told him that the rock ledge belonged to the old lady from whom the defendant acquired quarrying rights. This the plaintiff denies. The old stone wall boundary line fence between the properties should have indicated to the defendant that the rights it had acquired ended at the fence. The road maps also show the property lines and that the end of the ledge extending into the right of way was appropriated from the plaintiff's property. Moreover, the plaintiff's undisputed testimony is that he notified defendant's superintendent that he owned the land where the quarrying was being done. Even if the defendant acted innocently at the outset and supposed that it had acquired the right to quarry at the ledge, it must have known before it proceeded with the actual work of blasting that the site belonged to the plaintiff. It is more probable that after quarrying all that part of the ledge that extended into the right of way it extended its operations upon plaintiff's property believing that plaintiff was not suffering much damage and that settlement could be made later on.

Nevertheless the rule that the wrongdoer's gain should be the measure of the damages should be considered in the light of the plaintiff's conduct. If the plaintiff wanted his pound of flesh, he should have been careful not to spill any blood. The quarry operations extended over a period of months. The blasting and the removal of the loose rock was not a single trespass and conversion. A blast was set off, a quantity of rock loosened, and removed from the plaintiff's premises across the road to the crusher. Then the operation was repeated. The plaintiff lived only a stone's throw from the quarry. He was around the job almost daily. While he notified the superintendent that the ledge was on his

lands, he did not forbid the defendant from continuing operations. His attitude rather suggested that the defendant might proceed but at the risk of being made to pay liberally for the stone later on. If the plaintiff had ordered the defendant off his premises it must be assumed that it would have obeyed the order. Failing to do so, the plaintiff neutralized the wantonness and willfulness of defendant's continuing trespass and himself became a party to the repetition of the wrong. Under such circumstances he should not recover more than the value of the stone in its natural state before its value had been enhanced by the defendant's blasting operations. The plaintiff's experts say that the solid rock was reasonably worth fifteen cents per cubic yard, and that the measurements of the quarry excavation, as well as a calculation based on the loose rock used in the road, shows that 12,000 cubic yards, solid measure, were taken from plaintiff's property, for which the plaintiff should recover at the rate of fifteen cents per cubic yard.

In view of plaintiff's acquiescence, no crime was committed, and section 1433 of the Penal Law, dealing with a willful injury to real property and providing for treble damages, is not applicable. Moreover, when treble damages are sought the demand therefor should be made in the complaint. (*Livingston* v. *Platner*, 1 Cow. 175; *Brown* v. *Bristol*, Id. 176; *Hubbell* v. *Rochester*, 8 id. 115; *Salmon* v. *Blasier Mfg. Co.*, 53 Misc. 36.)

If the plaintiff had set forth in his complaint a demand for treble damages, and pointed out the statute upon which he relied, the defendant probably would not have entered into the stipulation admitting the allegation in the complaint that the defendant " wantonly, willfully, wrongfully and unlawfully trespassed upon * * * and removed stone and converted the same to its own use." By the stipulation the parties intended that the trial justice should determine single and not treble damages. Paragraph 3 of the stipulation is as follows: " That the determination of the amount of damages by said Justice shall be of the same force and effect as though determined by a jury after the trial of the action and the amount so found by the said Justice shall be the amount of the judgment in this action." By this stipulation the plaintiff waived his right to treble damages, even if entitled thereto, because a jury may not award treble damages, and under the stipulation it is only such damages as a jury might find that shall be determined by the justice, and it is stipulated that only the amount of such damages shall be the amount of the judgment in this action.

Plaintiff is entitled to a judgment for $1,800, and costs.